1

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

3

**SAN JUAN CABLE LLC d/b/a ONELINK
COMMUNICATIONS,**

4

   **Plaintiff,**

5

**v.**                                                      **CIVIL NO. 09-1119 (GAG)**

6

7

**TELECOMMUNICATIONS
REGULATORY BOARD OF PUERTO
RICO, et al.**

8

   **Defendants.**

9

10

**OPINION AND ORDER**

11

        Plaintiff San Juan Cable LLC d/b/a OneLink Communications ("OneLink") filed the present

12

action against the Telecommunications Regultatory Board of Puerto Rico, Miguel Réyes Dávila in

13

his official capacity as President thereof, Vicente Aguirre Iturrino and Nixyvette Santini Hernández

14

Dávila in their official capacities as Associate Members thereof (collectively the "Regulatory

15

Board"), and the Puerto Rico Telephone Company, Inc. ("PRTC"), alleging violations to the Cable

16

Act, 47 U.S.C. §§ 521 et seq., and requesting injunctive and declaratory relief.  Specifically, plaintiff

17

requests in its complaint that the court, pursuant to 42 U.S.C. § 1983, enjoin the Regulatory Board

18

from authorizing the PRTC to provide cable services or construct a cable system over public rights-

19

of-way unless and until a final decision is reached granting PRTC's Franchise Application for the

20

provision of its cable service, Claro TV, in accordance with federal law.  Plaintiff further requests

21

that the court vacate the Regulatory Board's order approving PRTC's application for "special

22

temporary authority to provide video service" ("STA" application) as part of "a temporary, beta-

23

testing phase" of Claro TV, to be provided to two hundred PRTC employees free of charge "for a

24

minimum of eight (8) weeks or until the regular service begins."  Docket No. 8-2 at 4.

25

        Presently before the court is plaintiff's application for a temporary restraining order ("TRO")

26

27

28

**Civil No. 09-1119 (GAG)**

and preliminary injunctive relief (Docket No. 7).[1]  A TRO is available under Fed.R.Civ.P. 65 to a litigant facing a threat of irreparable harm before a preliminary injunction hearing can be held.  See 11A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2951 (1996 & Supp. 2008).   When the opposing party has notice, an opportunity to respond, and an adversarial hearing is held, the standards for issuing a TRO are substantively similar to those for a preliminary injunction.  See id.  OneLink, as the moving party, bears the burden of perssuassion to show: 1) a substantial likelihood of success on the merits; (2) a significant risk that it will suffer irreparable harm if the TRO is denied; (3) the harm it will suffer outweighs any harm that the TRO will cause to the defendants; and (4) the TRO "will promote (or, at least, not denigrate) the public interest." See McGuire v. Reilly, 260 F.3d 36, 42 (1st Cir.2001) (stating the four-factor test for issuance of a preliminary injunction).  The First Circuit has held that likelihood of success is an essential prerequisite for the issuance of a preliminary injunction.  Black Tea Soc'y v. City of Boston, 378 F.3d 8, 14 (1st Cir. 2004).  Furthermore, where federal statutory violations are involved, courts have interpreted that "only a bare minimum showing of irreparable harm is required before a court may issue injunctive relief."  Century-ML Cable Corp. v. Díaz, 43 F. Supp. 2d 166, 172 (D.P.R. 1998); see also Time Warner Cable of New York City v. Freedom Electronics, Inc., 897 F.Supp. 1454, 1460 (S.D.Fla.1995) ("[S]everal federal courts have held that absence of justification for violation of clear statutory rights virtually eliminates the necessity of showing irreparable harm"); Home Box Office, Inc. v. Pay TV of Greater New York, 467 F.Supp. 525, 529 (E.D.N.Y.1979) ("where a defendant shows no justification for continuing to violate a Plaintiff's clear statutory rights, there is no reason to withhold preliminary relief even without a showing of the same quantum of 'irreparable' damages as would be required where Plaintiff's ultimate success was more doubtful").

---

[1] The court notes that this matter is being decided on the briefs given that the parties have represented to the court that the salient facts are not in the dispute.

**Civil No. 09-1119 (GAG)**

Plaintiff argues that defendants have violated Section 621 of the Cable Act, which states that "a *cable operator* may not provide *cable service* without a franchise." 47 U.S.C. § 541(b)(1) (emphasis added). The Cable Act's definition section gives these quoted words meaning. "[T]he term 'cable operator' means any person or group of persons (A) who provides cable service over a cable system and directly or through one or more affiliates owns a significant interest in such cable system, or (B) who otherwise controls or is responsible for, through any arrangement, the management and operation of such a cable system." 47 U.S.C. § 522(5). In turn, "cable service" is defined as "(A) the one-way transmission to subscribers of (i) video programming, or (ii) other programming service, and (B) subscriber interaction, if any, which is required for the selection or use of such video programming or other programming service." 47 U.S.C. §522(6). Defendants make various arguments in order to convince the court that the franchise requirement of section 621(b)(1), 47 U.S.C. §541(b)(1), does not apply to the testing phase of the Claro TV service.

First, defendants contend that the statutory definition of "cable service" requires that programing be transmitted to "subscribers," meaning paying customers, and that the two hundred PRTC employees that will participate in the trial are not "subscribers" because they will be receiving the service for free. Thus, until PRTC begins to charge for its services, it is not providing a "cable service" and is exempt from the franchise requirement of the Cable Act. The Cable Act itself, however, does not define the term "subscriber." PRTC cites other sections within the Cable Act, as well as other Congressional statutes regulating the transmission of video programming, in order to support its argument that "cable service" under the Cable Act is of a commercial character. See 47 U.S.C. § 522(13) (defining "multichannel video programming distributor" as "a person such as, but not limited to, a cable operator, [etc.] [. . .] who makes available for purchase, by subscribers or customers, multiple channels of video programming"); 47 U.S.C. § 542(c), 543(a)(1) (provision of the Cable Act regulating subscribers' bills and the rates for the provision of cable services); 17 U.S.C. §111(f) (copyright statute that defines cable system as a system that provides video programming "to subscribing members of the public who pay for such service"). Though the court

Civil No. 09-1119 (GAG)

1    agrees with PRTC, that the Cable Act intends to require franchise authorization for the provision of

2    commercial cable services, the court is not entirely persuaded by the argument that, because PRTC

3    is not yet charging for the service, the same is not already commercial in character. The Regulatory

4    Board approved PRTC's application for special temporary authority to provide video service in

5    contemplation of PRTC's application for a franchise. In its STA application PRTC states that "the

6    pre-release version of Claro TV that would be provided under the beta-testing phase would rely on

7    the same technology and network configurations that would be used to provide Claro TV if [the

8    Regulatory Board] grants [PRTC's franchise application]." Docket No. 8-2 at 2. The STA

9    application further requests the Regulatory Board's permission "to construct facilities for the delivery

10   of video service, and to provide video service, for a minimum of eight (8) weeks or *until the regular*

11   *service begins*[. . .]." Id. at 4 (emphasis added). The Regulatory Board concedes that it has

12   authorized this "pilot program" to test PRTC's new technology in order to further the public interest

13   by ensuring that PRTC provides the best possible service, in case its franchise application is

14   approved. Docket No. 29 at 14. Because the trial phase is designed to advance PRTC's construction

15   of a cable service for commercial purposes, the court finds that PRTC is indeed offering a "cable

16   service," as defined in the Cable Act, through the implementation of its limited test trial.

17         Alternatively, PRTC argues that the facilities it will use in connection with the trial do not

18   constitute a "cable system" under the Cable Act because they are existing and upgraded, "mixed use"

19   facilities that do not trigger the franchise obligation "until and unless [PRTC] proposes to offer cable

20   services." In re Implementation of Section 621(a)(1) of the Cable and Communications Policy Act

21   of 1984, 22 F.C.C.R. 5101, 22 FCC Rcd. 5101, 5155 (Mar. 5, 2007) (report and order of the Federal

22   Communications Commission ("FCC") adopting rules and providing guidance to implement Section

23   621(a)(1) of the Cable Act, which prohibits franchising authorities from unreasonably refusing to

24   award competitive franchises for the provision of cable services). In its report and order, the FCC

25   provides that "assuming an entity [. . .] already possesses authority to access the public rights-of-way,

26   [a local franchising authority] may not require [a local exchange carrier] to obtain a franchise solely

27

28                                                   4

Civil No. 09-1119 (GAG)

1   for the purpose of upgrading its network. *So long as there is a non-cable purpose associated with*

2   *the network upgrade*, the [local exchange carrier] is not required to obtain a franchise until and

3   unless it proposes to offer cable services. For example, if a [local exchange carrier] deploys fiber

4   optic cable that can be used for cable and non-cable services, this deployment alone does not trigger

5   the obligation to obtain a cable franchise." Id. (emphasis added).  In so holding, the FCC was

6   concerned with local franchising authorities overextending their limited jurisdiction under the Cable

7   Act and attempting to regulate activity unrelated to the provision of video programming, impinging

8   on the right of private entities to develop and upgrade their systems to their fullest potential.  It did

9   not hold, as PRTC contends, that just because a telephone company uses the same cable system for

10  a different activity, it should be exempt from complying with the Cable Act's franchise requirement

11  where, as in the present case, such company intends to upgrade existing facilities in order to make

12  the provision of cable services viable.  PRTC would have this court believe that it does not "propose

13  to offer cable services," when it is precisely for that reason that it wishes to conduct a beta-testing

14  trial of its system.[2]

15        Finally, PRTC contends that the nature of its system excepts it from the franchising

16  requirement because it does not employ the public rights of way.  The Cable Act excludes from its

17  definition of "cable system" facilities that serve subscribers "without using any public right-of-way."

18  47 U.S.C. §522(7).  This argument, however, is negated by the fact that the STA application

19

20

21        [2] PRTC makes the far-fetched extrapolation that by this logic "a telephone company may
provide broadband services today over local loops and other facilities without a franchise, but the
22  moment it submits its application (i.e. 'proposes') to provide cable service using those facilities, they
are instantly deemed to be a 'cable system' and the telephone company must *stop* using those
23  facilities (or upgrading them) to provide the broadband service and disconnect consumers until and
unless it receives a franchise." Docket No. 44 at 11. PRTC's statement is disingenuous. OneLink
24  has not requested that this court enjoin PRTC from using its facilities or that it order PRTC to
"disconnect consumers."  What is before the court is a petition for a temporary restraining order and,
25  ultimately, a preliminary or permanent  injunction to bar the Regulatory Board from allowing PRTC
to use such facilities *for the provision of cable services* if and until it acquires a franchise as required
26  by federal law, nothing more.

27

**Civil No. 09-1119 (GAG)**

1  approved by the Board contains a request for "a grant of authority to use, occupy, and construct
2  facilities in the public rights-of-way [sic.], if necessary[. . .]." Docket No. 8-2 at 4.

3        As for the Regulatory Board's argument that the Cable Act allows it to authorize pilot
4  programs of limited duration to test new technologies that are relevant to pending proceedings, the
5  court finds to the contrary. The Regulatory Board cites several examples to support its claim that
6  the FCC "has often authorized pilot programs of new technologies." Docket No. 29 at 7; see In re
7  Rural Health Care Support Mechanism, 23 F.C.C. Rcd 17396 (Dec. 5, 2008) (granting request to
8  participate in an ongoing FCC pilot program, established pursuant to 47 U.S.C. § 254(h)(2)A), which
9  explores methods to enhance health care providers' access to advanced telecommunications and
10  information services); In re An Inquiry Relative to the Future Use of the Frequency Band 806-960
11  MHz, 51 F.C.C. 2d 945 (Mar. 20, 1975) (describing an FCC pilot program to put into practice
12  techniques using new technology); Report on Creating an FCC for the Information Age, 1995 FCC
13  LEXIS 688, at *23 (FCC February 2, 1995) (describing a pilot program initiated by the FCC using
14  customer of the Private Land Mobile Radio Services to set customer service standards); Office of
15  Communications, Inc. of the United Church of Christ, et al. v. F.C.C., 327 F. 3d. 1222, 1227 (D.C.
16  Cir. 2003) (referring to a pilot program that Congress approved to explore advertising related to
17  broadcasting). None of these examples, however, involve a pilot program initiated by a company
18  that has already submitted a franchise application and is in the process of being evaluated by the
19  FCC. The examples given by the Regulatory Board were all FCC-initiated and were not designed,
20  as in the present case, to perfect a franchise contender's cable system before approval of the
21  franchise.

22        For the foregoing reasons, the court finds that there has been a violation of Section 621 of
23  the Cable Act, 47 U.S.C. §541(b)(1), which states that a cable operator cannot provide cable services
24  without a franchise. Given this violation, the court finds that plaintiff OneLink has a strong
25  likelihood of success on the merits.

26        Defendants shall, **on or before Friday, Feburary 20, 2009, at noon**, SHOW CAUSE as to
27  why a preliminary injunction should not issue, limiting their arguments as to the remaining three

28                                         6

**Civil No. 09-1119 (GAG)**

injunction factors.  Plaintiff may file a simultaneous memorandum also discussing the three factors.

**SO ORDERED.**

In San Juan, Puerto Rico this 18th day of February, 2009.

*S/ Gustavo A. Gelpí*

GUSTAVO A. GELPI
United States District Judge

7